UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------

A.C. and M.C., on behalf of M.C.,

                            Plaintiffs,

        - against -

Chappaqua Central School District,

                            Defendant.

-----------------------------------------------------------------

JUDGE KARAS

08 CV 3163

**COMPLAINT**

      Plaintiffs, A.C. and M.C., on behalf of M.C., by their attorneys, Mayerson & Associates, as and for their Complaint against defendant, Chappaqua Central School District ("CCSD"), allege and states the following:

      1. Plaintiff M.C., the son of plaintiffs A.C. and M.C., is a minor child who has been diagnosed with an autism spectrum disorder. M.C. was at all relevant times was and is a student residing within the CCSD entitled to all rights, entitlements, and procedural safeguards mandated by applicable law and statutes including, but not limited to the Individuals with Disabilities Education Improvement Act ("IDEIA"), 20 U.S.C. § 1400, *et. seq.*, the pertinent implementing regulations promulgated under the Code of Federal Regulations, Article 89 of the New York State Education law and Part 200 of the Commissioner's Regulations.

      2. Plaintiffs A.C. and M.C. are the parents of M.C. Plaintiffs are residents of the State of New York, residing at all relevant times at an address, in Chappaqua, within the CCSD.

      3. M.C. and his parents A.C. and M.C. are not expressly named herein by their given names or specific address because of the privacy guaranteed in the IDEIA statute and in the Family Educational Rights Privacy Act, 20 U.S.C. § 1232(g) and 34 C.F.R. § 99.

4. Defendant CCSD, upon information and belief, is a duly constituted school district organized under the laws of the State of New York, and is the "local education agency" charged with the obligations to provide M.C. with a free and appropriate public education ("FAPE"), *see infra*, ¶ 9.

5. Plaintiffs, pursuant to N.Y. Educ. Law § 4404 and 20 U.S.C. § 1400, *et. seq.*, more commonly known as the IDEIA, seek a review and reversal of the State Review Officer's ("SRO") November 30, 2007 Decision which dismissed, on statute of limitations grounds, plaintiffs' request for an impartial hearing concerning a dispute that arose concerning the appropriateness of the Individual Education Plan ("IEP") developed by the CCSD for purposes of the 2005-2006 school year.

6. Plaintiffs seek reversal of the underlying administrative Decision and a remand of these proceedings for an impartial hearing at the administrative level, so that plaintiffs' tuition reimbursement claims for the 2005-2006 school year can be heard and adjudicated on the merits.

7. As any application of a period of limitations involves either a pure question of law or, at best, a mixed question of law and fact, the issue for this Court to decide is subject to a purely *de novo* review.

8. This Court, pursuant to 20 U.S.C. §§ 1415(i)(2) and (3), 34 C.F.R. §§ 300.516 and 300.517, 28 U.S.C. §§ 1331 and 1367, has jurisdiction of this action without regard to the amount in controversy. Venue is proper in that plaintiff and defendant both reside in or are situated in this District.

9. Pursuant to the IDEIA statute, as well as the New York State Education Law, all school agencies within the State are required to offer eligible students with disabilities special education programs and services that are tailored to meet the individual needs of each child with a

disability. The FAPE required under IDEIA will be different for each child, as IDEIA does not permit a "one size fits all" approach.

10. On or about July 24, 2007 (*less than* two years after plaintiffs gave defendant a "ten day notice" regarding claims for the 2005-2006 school year) plaintiffs filed a demand for due process to challenge the IEP that the CCSD had offered plaintiff M.C. for the 2005-2006 school year and to seek tuition reimbursement. In their demand, plaintiffs expressly advised the CCSD that there would be clarifying amendments to provide further particulars of plaintiffs' claims.

11. On or about July 31, 2007, CCSD moved to dismiss the underlying impartial hearing and deprive M.C. of his day in court based upon "pleading sufficiency" and an ostensible application of the IDEIA's two-year statute of limitations – a limitations period that first came into effect on July 1, 2005. 20 U.S.C. § 1415(b)(6)(B); 34 C.F.R. § 300.507 (a)(2); 34 C.F.R. § 300.511(e).

12. On or about August 9, 2007, plaintiffs' amended their original due process request to include the promised pleading particulars, thus rendering CCSD's dismissal motion moot and academic as to the sufficiency of pleading issue.

13. Impartial Hearing Officer Jean M. Brescia ("IHO") requested both parties submit memos of law briefing two issues: first, whether the CCSD's motion to dismiss based on pleading sufficiency was moot; and second, whether the CCSD's motion to dismiss based upon statute of limitations should also be dismissed.

14. On or about September 5, 2007, the IHO issued a Decision and Order holding that plaintiffs' due process request was time-barred under the IDEIA's two-year statute of limitations because the "trigger" date was the date of the CSE meeting or, in the alternative, the date when plaintiffs *received* the IEP.

15. Although defendant had convened an IEP meeting on June 15, 2005, the CCSD Board of Education ("BOE") did not meet to approve such IEP until July 12, 2005 (nearly one month later), and such approval was not mailed out until July 19, 2005, triggering applicability of new federal statutory changes that went into effect on July 1, 2005.

16. Although defendant took over a month to consider approval of its own IEP, the IHO essentially held that parents do not have *any* time to see, much less consider or dispute the IEP before their claims begin to accrue. The IHO improperly *deemed* the "dispute" to have arisen the day that plaintiffs received defendant's proposed IEP.

17. In actuality, plaintiffs gave notice of their dispute only five days later, on July 25, 2005, and the record reflects that plaintiffs' hearing request was filed on July 24, 2005, i.e., *within* two years of that day.

18. On or about October 4, 2007, plaintiffs appealed the IHO's decision to the New York Office of State Review ("SRO"). At the outset, plaintiffs requested recusal of SRO Paul F. Kelly, alleging an appearance of bias, partiality and conflict of interest based upon a disturbing July 24, 2007 front-page Wall Street Journal article.[1]

19. By Decision dated November 30, 2007, the SRO affirmed the Hearing Officer's decision in its entirety, holding that the accrual date for the running of the two-year statute was July 20, 2005, the date that plaintiffs' *received* the IEP in the mail (and not the date, five days later, when plaintiffs communicated that they were disputing the IEP that they had just received).

20. CCSD claims to have a viable and enforceable IEP in place as of M.C.'s June 15, 2005 IEP meeting. This is not the case either as a matter of fact or as a matter of law. There was not even an IEP document *generated* as of June 15, 2005. Moreover, plaintiffs did not receive a copy of the proposed IEP until July 20, 2005, nearly 35 days later. Defendant took the

---

[1] A copy of this article has been annexed hereto as Exhibit A.

intervening time to prepare the IEP document, and to have it reviewed and approved by its BOE.[2]

21. When, in late July 2005, defendant provided plaintiffs with the IEP that its BOE had reviewed and approved, defendant did not provide plaintiffs with any notice that plaintiffs' claims, if any, would now be governed by a two-year statute of limitations. The documentary evidence establishes that, at the very earliest, plaintiffs did not develop such a notice until on or about September 13, 2005.

22. The state regulatory scheme can always provide *greater* rights and entitlements to children, such as the Commissioner has done in N.Y. Comp. Codes R. & Regs. § 200.13(d) concerning enhancements for speech and language service for children diagnosed with autism spectrum disorders. However, no state or SRO can diminish greater protections that are offered under the federal statute. That is the basis of federal preemption. In other words, the federal IDEIA protections concerning a two-year period of limitations is the only applicable limitation period, even assuming for the sake of argument that the period commenced to run and was not tolled or subject to some recognized statutory exception (which, as explained below, it was here). Accordingly, there is no "one-year" or other shorter period of limitations that is applicable in this case.

23. The federal IDEIA expressly provides two exceptions to the timeline in which parents must request a due process hearing. "The timeline described...*shall not apply* to a parent if the parent was prevented from requesting the hearing due to...the local educational agency's withholding of information from the parent that was required under this part...to be provided to

---

[2] Defendant took over one month to consider and approve its IEP. The Hearing Officer did not accord any such review period to plaintiffs, who were arbitrarily deemed to have rejected the IEP on the very date when they received it, when in fact, plaintiffs did not advise defendant that they were rejecting the IEP that they had received until several days later.

the parent." 20 U.S.C. § 1415(f)(3)(D)(ii), 34 C.F.R. § 300.511(f)(2) (emphasis added). The local education agency is *required* to provide a procedural safeguards notice notifying the parents of the "time period in which to file a complaint." 34 C.F.R. § 300.504(a)(2), 34 C.F.R. § 300.504(c)(5)(i). The CCSD *withheld* this information from M.C. and his parents at precisely the time that they needed it and were entitled to it.

24. The Second Circuit, in considering a similar state law provision requiring the school district to provide notice of the limitations period as part of its procedural safeguards notice (prior to the 2004 reauthorization of the IDEIA), held that, in general, the statute does not begin to run, and is "equitable tolled" until the school district complies with the statutory notice requirement.[3] M.D. v. Southington Board of Educ., 334 F.3d 217, 223 (2d Cir. 2003).

25. In making its ruling, the Second Circuit held that such a standard was appropriate because "the notice requirement minimizes the inherent inequity between the legal knowledge and experience of the school board and that of the parent." *Id.* at 223-224. Such principles are all the more applicable now that the notice requirement is part of the federal statute and the record reflects here that defendant did not even prepare such a notice until September 13, 2005.

26. In view of the then *new* July 1, 2005 statutory changes in IDEIA concerning the applicable statute of limitations, and related requirements upon the local educational agency to notify parents of the new limitations period, and defendant's apparent failure to provide such notice until on or after September 13, 2005, it is plaintiffs' position that the two-year statute did not start to run until on or after September 13, 2005 or, in the alternative, on or after July 25, 2005, when plaintiffs gave written notice to defendant that they were rejecting and disputing the IEP that they had received from defendant in the mail only five days earlier.

---

[3] In M.D., the Second Circuit did not apply equitable tolling because of the specific, and quite different, facts of that case.

27. "The due process complaint must allege a violation that occurred not more than two years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the due process complaint." 34 C.F.R. § 300.507(a)(2).

28. The core issue in this case is the date of accrual, and the related issue of whether defendant, by its conduct, statutorily or equitably tolled the date of accrual. Given that there were salient statutory changes in the IDEIA that were implemented on July 1, 2005, plaintiffs consider this is a matter of first impression.[4]

29. The Second Circuit held, two years *prior* to the new statutory changes to IDEIA concerning the applicable period of limitations that the date of accrual is at the point when the parent unilaterally pulls their child out of the public school system. *See* M.D. v. Southington Board of Educ., 334 F.3d 217 (2d Cir. 2003). By letter dated July 25, 2005, plaintiffs notified defendant that M.C. was not going to be attending the proposed IEP placement for the 2005-2006 school year and that plaintiffs would be looking to defendant for tuition reimbursement. Plaintiffs' request for due process was filed *within* two years of July 25, 2005.

30. It is well established that "meaningful parental participation" in the IEP process is considered a fundamental statutory entitlement protecting the disabled child. In Board of Educ. v. Rowley, 458 U.S. 176, 208, 102 S.Ct. 3034, 3052 (1982), the Supreme Court explained the importance of parental involvement at *all stages* of IEP development. In Winkelman v. Parma City School Dist., 127 S.Ct. 1994, 167 L.Ed.2d 904 (2007), the Supreme Court held that parents of children with disabilities have their own independent entitlements under the IDEIA that correspond to their children's entitlements.

---

[4] In Brentwood Union Free School Dist. v. City of New York, 237 A.D.2d 141, 654 N.Y.S.2d 371 (App. Div. 1st Dept. 1997), the Court held that the cause of action for tuition reimbursement "began to run at the *conclusion* of the school year for which reimbursement is sought." (emphasis added). However, this case was decided by the New York State court system before the 2004 reauthorization of the IDEIA statute (which included the two-year statute of limitations).

31. If this Court were to affirm the underlying administrative decisions (arbitrarily deeming the "dispute" date to be the day when plaintiffs received the IEP), the effect would be to deprive plaintiffs of any opportunity for review and consideration, much less the month-long review period that defendant took for itself before the June 15, 2005 IEP was approved by defendant's BOE on July 12, 2005.

32. The CCSD contended in the proceedings below that accrual began at the June 15, 2005 IEP meeting. Neither the IHO nor the SRO addressed this issue, instead focusing purely on plaintiffs' July 20, 2005 *receipt* of the IEP. The CCSD's argument is clearly flawed insofar as it sets the date of accrual (the date on which M.C.'s parents could challenge the placement and recommendation of the CCSD) before the date, July 20, 2005, on which M.C.'s parents *received* the placement and recommendation.[5]

33. Notably, it is not what the CCSD recommends at the IEP meeting that determines M.C.'s programming, it is what is *actually written* on the IEP that determines M.C.'s programming. Ostensibly, in the intervening period, defendant could have generated a better IEP. Alternatively, if defendant's BOE rejected the proposed IEP, defendant could have offered M.C. something entirely different. In a potential cause of action for failing to provide services according to the IEP, it is what is *actually written* (not some oral agreement) that the school district is held accountable for. Therefore, it is imperative that parents review what is *written on the IEP*, rather than what is said by the school district at the IEP meeting, prior to board approval.

---

[5] Furthermore, the CCSD's Committee on Special Education's recommendations made at that June 15, 2005 IEP meeting were subject to review by the Chappaqua Board of Education ("BOE"). As indicated in a letter dated July 19, 2005 (and received by M.C.'s parents July 20, 2005), the Chappaqua BOE did not meet and approve the CCSD's recommendations until July 12, 2005.

34. M.C.'s parents promptly reviewed and responded to the CCSD (rejecting the IEP they had received) *five days* after receipt.[6] Plaintiffs commenced their impartial hearing within two years of sending that notice. If parents are to be *meaningfully* involved in the process, they need to be afforded the opportunity to *meaningfully* consider the program being offered before being "under the gun" to dispute such program. The local education agency is not deemed to have approved its IEP at the IEP meeting, but only after its school board takes action to approve. The IHO and SRO imposed an elevated, if not double, standard on plaintiffs by *deeming* that they were immediately disputing the IEP they had received *before* they took action to review and reject such IEP.

35. Importantly, in making the decision of whether to accept the CCSD's program, M.C.'s parents would have to take into account the fact that M.C. would have been leaving Eagle Hill School, which he attended during the 2004-2005 school year, if he was to return to a CCSD program for the 2005-2006 school year. M.C.'s parents would have needed at least a little time to observe and gauge the appropriateness of the recommended program given that there was no transition plan included in the IEP document.

36. The applicable decisional law instructs that in a close case, the courts should proceed to resolve conflicts in such a way as to *preserve* the rights of the child created by the IDEIA statute. *See* <u>Manning v. Fairfax County School Board</u>, 176 F.3d 235, 239 (4th Cir. 1999). This was not a close case, but assuming *arguendo* that it was, the SRO improperly resolved this conflict in such a way as to *deprive* M.C. of his federal due process entitlements.

---

[6] It should be noted that nearly every other school district provides parents with a notice accompanying the IEP that specifies the parents should *review* the IEP. It stands to reason that the accrual date should not begin until the parents have had the chance to actually *review* the IEP document.

WHEREFORE, by reason of the foregoing, this Court should (a) reverse the November 30, 2007 Decision of the State Review Officer, and (b) remand this matter for assignment to a new Impartial Hearing Officer for a hearing on the merits.

Dated: March 28, 2008
      New York, New York

                                                 Gary S. Mayerson (GSM 8413)
                                                 Mayerson & Associates
                                                 330 West 38th Street, Suite 600
                                                 New York, New York 10018
                                                 (212) 265-7200
                                                 (212) 265-1735 (facsimile)

Case 7:08-cv-03163-KMK   Document 1-2   Filed 03/28/2008   Page 1 of 4

Staying The Course: Schools Beat Back Demands For Special-Ed Services --- Parents Face Long Odds Amid Cost Concerns; Seeking a Home Tutor The Wall Street Journal July 24, 2007 Tuesday

1 of 1 DOCUMENT

Copyright 2007 Factiva ®, from Dow Jones
All Rights Reserved



(Copyright (c) 2007, Dow Jones & Company, Inc.)

**THE WALL STREET JOURNAL.**

The Wall Street Journal

July 24, 2007 Tuesday

**SECTION:** Pg. A1

**LENGTH:** 2347 words

**HEADLINE:** Staying The Course: Schools Beat Back Demands For Special-Ed Services --- Parents Face Long Odds Amid Cost Concerns;
 Seeking a Home Tutor

**BYLINE:** By Daniel Golden

**BODY:**

EAST ISLIP, N.Y. -- Paul McGlone, an iron worker, and his wife, Tricia, became worried in 2006 that their autistic son knew fewer letters in kindergarten than he had in preschool.

When the East Islip school district refused their request for at-home tutoring by an autism specialist, they exercised their right under federal special-education law to an administrative hearing. There, a hearing officer ordered East Islip to pay for seven hours a week of home therapy. The McGlones hired a tutor, and their son "started to click again," his mother says.

Then the district appealed the decision to Paul F. Kelly, the New York state review officer for special-education cases. He denied any reimbursement for home services. "The child's progress was consistent with his abilities," Mr. Kelly found in February. The family canceled the tutoring.

The McGlone case is part of a pattern that has many parents and advocates for the disabled in an uproar. They say administrative reviews in many parts of the U.S. overwhelmingly back school districts in disputes over paying for special-education services. State education departments, which have an interest in keeping down special-education costs, typically train or hire the hearing officers. Also, recent U.S. Supreme Court decisions and changes to federal law have made it harder for parents to win cases.

Although relatively few disputes between parents and school districts reach the hearing stage, the decisions set ground rules for how much extra assistance districts must provide disabled students, who comprise 14% of all public-school students. In recent years, schools have "mainstreamed" more students with disabilities in regular classrooms, hoping to benefit the children through interaction with nondisabled peers while saving money at the same time.

The battles reflect tension over the high cost of special education. In 1999-2000, the latest year for which figures are available, national spending on special education reached $50 billion, according to the Center for Special Education Finance, a nonprofit research group. In 2005-06, New York City's public school system alone spent $390 million on private education for disabled students considered unsuited to public school. Such tuition can cost $50,000 a year or more per pupil.

New York's Mr. Kelly is a particular target of special-education parents' anger. A study by Pamela Steen, a Patchogue, N.Y., lawyer for parents, found that he granted full or partial relief to districts in 60 of their 70 appeals, or 86%,

Case 7:08-cv-03163-KMK   Document 1-2   Filed 03/28/2008   Page 2 of 4

Staying The Course: Schools Beat Back Demands For Special-Ed Services --- Parents Face Long Odds Amid Cost Concerns; Seeking a Home Tutor The Wall Street Journal July 24, 2007 Tuesday

in 2006 and 2007. Andrew Cuddy, an Auburn, N.Y., lawyer who represents parents, says Mr. Kelly is "being dictated to" by the state education department to save money.

Last week, about 20 lawyers for parents met to discuss possible legal action against Mr. Kelly. Advocates for the disabled have complained about him to Gov. Eliot Spitzer. John Farago, a City University of New York law professor and a New York hearing officer, says Mr. Kelly is "rewriting the rule book" to challenge precedents that enabled parents to put children in private schools at public expense.

A spokesman said Mr. Kelly declined to comment because he serves in a quasijudicial capacity. Kathy Ahearn, state education department counsel, said Mr. Kelly decides each case on "its own unique facts" and the department doesn't influence his rulings.

Under the 1975 federal law now known as the Individuals with Disabilities Education Act, parents who believe public schools fail to provide their disabled children with a "free appropriate" education may seek redress in a hearing before an independent arbiter.

In some states, lawyers or retired school administrators work part-time as hearing officers. Elsewhere, a full-time official handles special-education hearings as part of a broader caseload. In New York and Pennsylvania, initial decisions may be appealed to a second tier of administrative review. Once they exhaust these reviews, parents may pursue their case in state or federal court.

Administrative review was conceived as a faster and cheaper way of resolving special-education wrangles than going directly to court. But school districts soon considered it a financial nightmare. When they lost, they often had to pay not only private tuitions but also parents' legal bills.

In 2004, Congress amended the disabilities act to require parents to attend a mandatory "resolution session" with school officials before a hearing. It also allowed a district to recover its legal costs from parents if it wins at hearing and the complaint is deemed frivolous.

Two U.S. Supreme Court decisions also lengthened odds against parents. In 2005, the court ruled that parents seeking relief must bear the "burden of persuasion" in hearings. That means when both sides' evidence is equally compelling, the hearing officer should rule in the district's favor. Previously, in about 15 states, precedent or state law placed the burden on districts, says education professor Perry Zirkel of Lehigh University in Bethlehem, Pa.

At hearings, parents rely on expert witnesses, such as child psychologists, to offset testimony from teachers and other school staff. But the Supreme Court ruled last year that, even if parents win hearings, they can't recoup witnesses' fees -- often $100 an hour or more -- from districts.

The number of hearings nationwide dropped 31% to 4,170 in 2005-06 from 6,038 the year before. Publicly funded placements in private schools, which had climbed to 73,149 in 2004 from 52,012 in 1996, fell to 71,082 in 2005, the latest year tallied by the U.S. Department of Education.

The Supreme Court's burden-of-persuasion precedent played a role last year when Carolyn and Charles Johnson of East Islip challenged their school district, on Long Island's southern side. The district had determined that the Johnsons' son, Andrew, a lean, restless six-year-old whom his mother calls "a friendly kid with no friends," didn't qualify for special education.

Only 9.6% of the district's students were in special education in December 2005, below a statewide average of 12.3%. The average special-education student cost East Islip $21,847 in 2004-05, compared with $9,550 for general students. Guercio & Guercio, a law firm that represents East Islip, said the district "is fully committed to providing an appropriate education to all of its students" and offers services to children with disabilities even if they aren't in special education.

Six health-care professionals agreed that Andrew, who suffers from a form of autism called Asperger's Syndrome, needed help with social skills. His kindergarten teacher testified that he slapped classmates, leveled their building-block towers, grabbed puzzle pieces out of their hands, and threw pretzels and Play-Doh across the room.

The district argued that Asperger's wasn't hampering Andrew academically, and his misbehavior wasn't unusual for kindergarten. Hearing officer Harry Kershen, a retired school administrator, came down on East Islip's side, citing the Supreme Court decision. Andrew has "certain quirks," but "his behavior wasn't all that off the wall," Mr. Kershen says.

Staying The Course: Schools Beat Back Demands For Special-Ed Services --- Parents Face Long Odds Amid Cost Concerns; Seeking a Home Tutor The Wall Street Journal July 24, 2007 Tuesday

Mr. Kelly, the New York state reviewer, upheld the ruling, leaving Andrew in a regular classroom without the aide the Johnsons sought. Mr. Kelly wrote that the record showed Andrew has "excellent work habits." The Johnsons appealed to federal district court in Central Islip, N.Y., in May.

Mr. Johnson, himself a middle-school principal in the Bronx, believes the district was ignoring his son's social needs. "Kids don't kill themselves because they can't pass algebra," he recalls telling district officials. "They kill themselves because they don't have friends."

New York State Assemblywoman Catherine Nolan says the Supreme Court's ruling has had a "chilling effect." A bill she filed to return the burden of persuasion to districts has passed the New York legislature but hasn't been sent to the governor yet. She believes the court meant its ruling to apply only to states that don't have their own laws on the matter.

Many districts are also limiting outside experts' access to classrooms. In California, a psychologist hired by parents of an autistic boy requested 90 minutes to observe an elementary-school program where the Capistrano school district wanted to place the child. After the district gave the psychologist 20 minutes, the parents sought a hearing. This past March, a federal court in Los Angeles reversed a hearing officer's ruling and ordered the district to reimburse the family for privately funded educational expenses.

In Reading, Mass., experts may observe for only 45 to 60 minutes, accompanied by school personnel. They must submit a resume and references to the district, and hand over copies of notes. "A lot of these evaluators are hired guns," says former Reading special-education director Stephen Gannon, who developed its policy.

The federal government doesn't track the outcomes of administrative hearings. But in most states that keep count, districts usually win. In New Jersey, districts prevailed in 27 of 28 hearings in 2005-06. In California, parents only won 11 of 119 hearings in that year. Districts prevailed in 77 cases, while the rest had mixed outcomes.

One Florida hearing officer was accused of reading during testimony for the parents. "Like some teenage girl reading a Harlequin romance novel during homeroom," the officer "attempted to hide the book behind a report cover," the parents' lawyer in the case wrote in a motion. The officer denied the allegation but recused herself from the case. She decided at least 25 special-education cases before retiring last fall, always in favor of the district.

School-board lawyers say they're winning because special-education services have improved. "Ten or more years ago, school districts frequently did not have adequate programs," says Charles Weatherly, whose Atlanta firm represents districts in several states and has also trained hearing officers. "Now that they have discovered the expense of litigation and of funding private placements, they're putting more money into programming."

Some parents and advocates for the disabled dispute that explanation. Former Pennsylvania hearing officer Linda Stengle, whose contract was not renewed last year, contends in a pending federal lawsuit against the state that its Office for Dispute Resolution "instructed hearing officers to selectively apply federal and state guidelines so that they always benefited school districts over parents." The office denies the allegations.

After hearing reviewers in Pennsylvania were accused of bias, the state overhauled its system for choosing them. Until recently, Pennsylvania had four appeals panels, each with a fixed roster of three administrative judges, to review initial rulings. In a federal lawsuit filed in 2005, lawyer Dennis McAndrews accused one of the four panels of bias, saying it decided 45 of 47 appeals for districts between August 2003 and August 2005.

Prof. Zirkel, the education professor at Lehigh University, was a member of that panel. He wrote most of its decisions, including one limiting the special-education services Mr. McAndrews's client could demand. Prof. Zirkel says his record over a longer period was less lopsided.

In May, the U.S. District Court in Philadelphia sided with Mr. McAndrews, ordering the state to take another look at the case. Around that time, the state dissolved the four panels. Now, a computer randomly assigns three judges to each case and picks which one will write the decision.

In New York, parents prevailed in 54% of issues adjudicated at hearings in 2005-06, according to state data. But the picture changes when either side appeals to Mr. Kelly. After a stint at Syracuse University teaching disability law and helping students represent the indigent, he became the state review officer in January 2003. While granting districts most of their appeals in 2006-07, he sided in full or part with parents filing appeals only 27% of the time, according to Ms. Steen, the lawyer who has studied his record.

Case 7:08-cv-03163-KMK    Document 1-2    Filed 03/28/2008    Page 4 of 4

Staying The Course: Schools Beat Back Demands For Special-Ed Services --- Parents Face Long Odds Amid Cost Concerns; Seeking a Home Tutor The Wall Street Journal July 24, 2007 Tuesday

When lawyers working for Mr. Kelly prepared decisions in favor of parents, he often overruled them, according to two former staff members.

New York created Mr. Kelly's office in 1990 after a federal court ruled it was a conflict of interest for the state education commissioner to judge appeals. The state reimburses districts for some special-education costs. Although the state education department employs Mr. Kelly, he is required to act independently of it.

Mr. Cuddy and other parents' attorneys say Mr. Kelly's independence is compromised by his relationship with Kathleen Surgalla, an assistant counsel for the state education department. Ms. Surgalla has trained the part-time officers who conduct the initial hearings and handled other special-education matters. Mr. Kelly and Ms. Surgalla live together in an Albany suburb, voter-registration records show.

Mr. Kelly and Ms. Surgalla declined to comment through a department spokesman. Ms. Ahearn said department employees have an "obligation to keep business separate from personal. . . . I feel comfortable and certain that there's no inappropriate conversation or influence going on."

After Mr. Kelly denied home-based autism therapy to the McGlones' son, they considered moving out of East Islip. Then the district's new special-education director promised them therapy at home this summer and a one-on-one aide in the school year beginning this fall. So far, the therapy is going well, says Ms. McGlone. In the first two weeks, her son has mastered four more letters of the alphabet, compared with seven in the just-concluded school year, she says.

"He has the ability to learn to read, and that could change his whole world," she says.

(See related letters: "Letters to the Editor: For Parents of Children with Special Needs, Public School Offers No Relief" -- WSJ July 31, 2007)



**Tough Case**
At hearings over special education, parents seeking extra services or private-school funding have an uphill battle. Results from 2005-06:

| | Parent wins | District wins | Split decisions |
|---|---|---|---|
| Calif. | 13 | | 31 |
| Fla. | 5 | 14 | 1 |
| Mass. | 9 | 16 | 9 |
| Conn. | 7 | 12 | 2 |
| N.J. | 1 | 27 | 0 |

Source: the states

License this article from Dow Jones Reprint Service

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** July 31, 2007